**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-86 (BAH)** |
| **MICHAEL LEE ROCHE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael Lee Roche to 18 months' imprisonment, 3 years of supervised release, $2,000 in restitution, a $100 mandatory special assessment for Count One, a $25 mandatory special assessment on each of Counts Two and Three, and a $10 mandatory special assessment on each of Counts Four, Five, and Six, for a total of $180.

## I.      INTRODUCTION

Following a stipulated bench trial on March 10, 2023, this Court convicted Michael Lee Roche ("Roche"), of all six counts in the Indictment.  The stipulated facts submitted at trial showed that Roche participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of the date of this submission, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the

In summary, Roche travelled from his home in Murfreesboro, Tennessee to attend the rally for then-President Donald Trump on January 6, 2021.   He entered the Capitol Building with a large crowd of rioters that poured in through the Senate Fire Door, near the Parliamentarian's Office.   He paraded through the Capitol Building for approximately 15 minutes and was part of a crowd that pushed their way past several officers trying to contain the crowd in the vicinity of the North Door Appointment Desk.   At approximately 3:03 p.m., Roche entered the Senate Floor and made his way to the Vice President's desk, where he would remain for approximately seven minutes. During that time, Roche shouted, prayed, and posed for photos while other rioters rummaged through the desks on the Senate Floor.   Police officers were able to remove Roche and other rioters from the Senate Floor and out of the Capitol Building at approximately 3:10 p.m. While outside the building, Roche stated that he got "a chance to storm the Capitol" and bragged that he "made it into the . . . chamber."

The government recommends that the Court sentence Roche to 18 months' incarceration, the mid-point of the applicable Sentencing Guidelines advisory range of 15 to 21 months' incarceration, which the government submits is the correct Guidelines calculation. An 18-month sentence reflects the gravity of Roche's conduct, but also acknowledges his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts for Stipulated Trial filed in this

United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

case, ECF 61 ¶¶ II.1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Michael Lee Roche's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Roche attended the rally for then-President Donald Trump in Washington, D.C. to protest the certification of the Electoral College vote for the 2020 Presidential Election.   He was wearing a dark jacket with gray sleeves, yellow-tinted glasses, and a red wool cap with the word "Trump" in white letters and a "45" on the front.

At some point that day, Roche left the rally and marched towards the Capitol Building with other protestors.   At approximately 2:42 p.m., a crowd that had amassed outside the Senate Parliamentarian Door (also called the Senate Fire Door) successfully breached open the door – with one individual using a crowbar to knock out the glass panels on the door—pushed back officers, and allowed rioters to pour into the Capitol.   Three minutes later, at approximately 2:45 p.m., Roche entered the Capitol with a crowd of rioters through the Senate Fire Door.   *See* Trial Ex. 1 at 1:48.



Trial Ex. 1.1



Trial Ex. 1.2

Roche paraded through the Capitol for approximately 15 minutes and made his way to the

vicinity of the North Door Appointment Desk by approximately 2:58 p.m.   The crowd, of which

Roche was a part, was chanting and raising their fists in the air.   Initially three officers attempted

to stop the crowd from moving any further into the Capitol.   Three other officers responded and attempted to contain the crowd.   Two of the officers were wearing riot gear.   Another two attempted to direct two rioters down a hallway.   Those two rioters resisted, and a brief confrontation ensued between the rioters and the officers.   *See* Trial Ex. 2 at 0:26.   At one point after the confrontation, Roche raised his hand in the air and pointed down one of hallways the officers were blocking. *See* Trial Ex. 2 at 1:28.



Trial Ex. 2.1



Trial Ex. 2.2



Trial Ex. 2.3

After a couple of minutes of shouting between the rioters and the officers, the crowd, including Roche, slowly moved closer to the officers, causing them to step back.   By approximately 3:01 p.m., the mob of rioters, including Roche, overwhelmed the officers and moved further down the hallway.   *See* Trial Ex. 2 at 3:19.   Roche continued through the Capitol, climbing the steps near Senate Office S214 at approximately 3:02 p.m.   *See* Trial Ex. 3.   As he climbed the steps, he observed other rioters shuffling through papers on a desk near Senate Office S214.   *See* Trial Ex. 3 at 0:29.


Ex. 3.1

Roche then proceeded past the Senate Door Elevators towards the Senate Floor.   *See* Trial Ex. 4 at 0:05.



Trial Ex. 4.1

At approximately 3:03 p.m., Roche entered the Senate Floor.   *See* Trial Ex. 5 at 0:22, Ex. 6 at 0:44.   When he walked in, Jacob Chansley (a/k/a the "QAnon Shaman") was already standing behind the Vice President's desk, wearing a fur head covering with horns, and holding an American flag and a bullhorn.   As soon as Roche entered the Senate Floor, he walked directly behind the Vice President's desk and stood next to Chansley.   *See* Trial Ex. 6 at 0:44.   Other rioters joined Roche and Chansley behind the Vice President's desk.   While Roche was behind the Vice President's desk, rioters on the Senate Floor used their cell phones to take photos and videos and searched through papers on and in various senators' desks.   *See* Trial Ex. 6 at 0:50-1:30.



Trial Ex. 5.1

At approximately 3:04 p.m., Roche began shouting and raising his arms in the air.  *See* Trial Ex. 6 at 1:45.   His shouting lasted approximately 30 seconds, the end of which can be heard in Trial Exhibit 5.   Trial Ex. 5 at 0:25.   Chansley then used a bullhorn to shout to the rioters, giving thanks for the opportunity "to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs, that we will not allow America, the American way of the United States of America to go down."   Trial Ex. 5 at 0:30-1:50.   Chansley went on to say "[t]hank you for allowing the United States of America to be reborn.   Thank you for allowing us to get rid of the communists, the globalists, and the traitors within our government." *Id.*   As Chansley was shouting in the bullhorn, Roche bowed his head, raised his arms at times in acknowledgment, and when Chansley was finished, Roche shouted, "Amen!"   *See id.*



Trial Ex. 5.2



Trial Ex. 5.3

Roche remained on the Senate Floor behind the Vice President's desk for approximately

seven minutes.   At one point, he picked up the bible that was on the desk and held it up in the air.

*See* Trial Ex. 6 at 4:13.   Roche then posed for a photo with Chansley while holding the bible.   *See*

Trial Ex. 6 at 4:50.   Roche then put the bible back down on the desk.



Trial Ex. 6.1



Trial Ex. 6.2

While Roche was behind the desk, other rioters paraded around the Senate Floor, sat at senators' desks, and posed for photos with their cell phones.   At one point, several rioters posed for a photo with Chansley.   One rioter picked up the bible that was on the Vice President's desk and held it up for the photo.   Roche used a rioter's cell phone to take a photo of the rioters behind the Vice President's desk.   *See* Trial Ex. 6 at 5:07.



Trial Ex. 6.3

At approximately 3:08 p.m., U.S. Capitol Police ("USCP") officers entered the Senate Floor and directed Roche and the other individuals to leave the Chamber.



Trial Ex. 6.4

Roche was escorted off the Senate Floor with the others and then exited the Capitol

Building through the Senate Carriage Door at approximately 3:10 p.m.   *See* Trial Ex. 7.



Trial Ex. 7.1

13

Outside the Capitol Building, Roche was filmed in a video that was posted to Facebook. *See* Trial Ex. 8.   In the video, Roche stated, in part:

> My name is Michael Roche.   We're here in Washington, D.C. We
> did get a chance to storm the Capitol. And we made it into the . . .
> the chamber. . . .   We managed to convince the cops to let us
> through.   They listened to reason. And when we got to the chamber,
> all the people that was in there with me, there's plenty of people, we
> all started praying and shouting in the name of Jesus Christ, and
> inviting Christ back into our state capitol. And luckily nobody got
> hurt. There was somebody else who get hurt, apparently. We don't
> know too much about that. But, a great day to be alive.   And thank
> you police for the most part doing the right thing and listening to the
> will of the people.

## III.    THE CHARGES AND THE STIPULATED BENCH TRIAL

On March 16, 2022, a federal grand jury returned an indictment charging Roche with six

counts, including:

(1) Obstruction of an Official Proceeding and Aiding and Abetting, in violation of
    18 U.S.C. §§ 1512(c)(2) and 2;

(2) Entering and Remaining in a Restricted Building or Grounds, in violation of
    18 U.S.C. § 1752(a)(1);

(3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in
    violation of 18 U.S.C. § 1752(a)(2);

(4) Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C.
    § 5104(e)(2)(A);

(5) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C.
    § 5104(e)(2)(D); and

(6) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40
    U.S.C. § 5104(e)(2)(G).

On, March 10, 2023, following a stipulated bench trial, this Court found Roche guilty of

all six charges.   Roche admitted an extensive factual basis that supported his conviction.   *See*

ECF No. 61.

14

IV.    **STATUTORY PENALTIES**

Roche now faces sentencing on all six counts in the Indictment.   As noted by the Presentence Report ("PSR"), Roche faces up to 20 years imprisonment, a $250,000 fine, and a $100 mandatory special assessment on Count One; up to 1 year imprisonment, a $100,000 fine, and a mandatory special assessment of $25 on each of Counts Two and Three; and up to 6 months imprisonment, a $5,000 fine, and a mandatory special assessment of $10 on each of Counts Four, Five, and Six.   PSR ¶¶ 93-98; 123-28    Additionally, Roche faces a term of supervised release of up to three years on Counts One, Two, and Three.   PSR ¶¶ 103-05.

V.    **THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Here, the government agrees with the Guidelines calculation in the PSR.   *See* PSR ¶¶ 38-53.   Counts One, Two, and Three are grouped because the offense involved the same victim (Congress) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.   PSR ¶ 41; U.S.S.G. § 3D1.2(b).   The Sentencing Guidelines do not apply to Counts Four, Five, and Six because they are Class B or C misdemeanors.   PSR ¶ 43; U.S.S.G. § 1B1.9.   Therefore, pursuant to U.S.S.G. § 3D1.2(a)-(c),

the offense level applicable to the group comprised of Counts One, Two, and Three is the offense level which produces the highest offense level (*i.e.* Count One).   PSR ¶ 42.

<u>Count One: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| | **Total** | **17** |

PSR ¶¶ 44-53.

### *Adjustments*

Roche argues that the specific offense characteristic ("SOC") set forth in U.S.S.G. § 2J1.2(b)(2) does not apply based on Judge McFadden's holding in *United States v. Seefried*, No. 21-cr-287(2) (TNM), 2022 WL 16528415 (D.D.C. Oct. 29, 2022).   This Court came to the opposite conclusion in applying that enhancement, and the enhancement in U.S.S.G. § 2J2.1(b)(1)(B), in *United States v. Rubenacker*, No. 21-cr-193.   *See* Sentencing Tr. at 55-81. The government submits that this Court's ruling on that issue is the correct one.[2]

U.S.S.G. § 2J1.2, which applies to "Obstruction of Justice" offenses, provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).   In addition to this Court's ruling in *Rubenacker*, at least four other judges

---

[2]  Should the Court decline to apply this adjustment, the Government will seek an upward variance. *See United States v. Rubenacker*, No. 21-cr-193, Sentencing Tr. at 60-81 ("So even if defendant were correct – which he is not – that the SOCs in the guideline 2J1.2 did not cover congressional proceedings, … these SOCs capture specific harms warranting an increase in sentence severity … and warrant corresponding increases in the severity of the sentence by way of a departure or a variance"); *see also United States v. Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 36 ("it seems like it would lead to unwarranted sentencing disparities to apply [§ 2J1.2] … in only cases involving what we classically think of as administration of justice."); *id.* at 36-37 ("Even if I took the sort of plain language approach and did what you're suggesting, why wouldn't I, under 3553(a), enhance his sentence in a commensurate amount based on these enhancements? Why wouldn't I, by analogy, get to the same place under 3553(a)?").

of this Court have concluded, over defense objections, that the conduct of January 6 rioters who were guilty of violating 18 U.S.C. § 1512(c)(2) substantially interfered with the "administration of justice"). *See United States v. Reffitt*, No. 21-cr-032 (DLF), *United States v. Robertson*, No. 21-cr-34 (CRC); *United States v. Jensen*, No. 21-cr-6 (TJK); *United States v. Rahm*, No. 21-cr-50 (TFH); *United States v. Wright*, No. 21-cr-341 (CKK); *see also United States v. Wood*, No. 21-cr-223 (APM) (agreeing that the § 2J1.2(b) enhancements could apply in a January 6 case but finding the evidence did not support those enhancements in that case).

*First*, neither dictionary definitions nor usage analysis dictate that the term "administration of justice" be limited to a judicial or quasi-judicial proceeding. *See Rubenacker*, No. 21-cr-193, Sentencing Tr. at 62-63.   Judge McFadden was correct to note that the Black's Law Dictionary definitions of "administration of justice" and "due administration of justice" "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried*, 2022 WL 16528415 at *2.   However, Black's Law Dictionary also contains broader definitions of "justice" and "obstruction of justice," which relate to the orderly administration of the law more generally. *See Rubenacker*, No. 21-cr-193, Sentencing Tr. at 71-72.   For example, Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice."   Black's Law Dictionary (11th ed. 2019); *see also* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law").   Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court or legislature . . . . interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added).

17

Similarly, while the *Seefried* Court's survey of uses of the term "administration of justice" in legal usage does suggest that the phrase is frequently (and perhaps predominantly) used to refer to "a judicial proceeding deciding legal rights," and to lesser extent, to "law enforcement activities," *Seefried*, 2022 WL 16528415, *5-*7, the simple fact that the term usually bears judicial connotations does not mean that it must, particularly where, as here, the Guideline's context, purpose, and commentary point in a different direction.

Like all words, legal terms often bear multiple meanings.  For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense.   Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and its commentary. *See* U.S.S.G. § 2J1.2 cmt. n.1 (defining "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources") (emphasis added).

*Second*, Section 2J1.2's inclusion of definitions in the Commentary that undoubtedly relate to "investigations, verdicts, and judicial determinations" does not support a definition that excludes congressional proceedings.  The Commentary's use of the word "includes" indicates that the definition is not an exhaustive list.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012).   As Judge Friedrich explained,

> I also think Part J generally refers to the administration of justice, and I don't think that we can infer simply because the Commission didn't include the phrase, 'official proceeding of Congress,' that it meant for that type of offense prosecuted under

18

Section 1512(c)(2) to not be subject to the same aggravating factors that the Commission has delineated here.

*Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 37-38.   And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Nor does reading the Commentary's use of the word "governmental . . . resources"[3] to include congressional resources would not "render[ ] the phrase 'or court' superfluous." *Seefried*, ECF No. 123 at 17.   Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is not a superfluity.   The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts.   And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial).   The superfluity canon provides no basis to limit the term to "prosecutorial resources."   *Id.*   Indeed, if the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous.

---

[3] The government's position that the events of January 6, 2021 caused the unnecessary expenditure of substantial governmental or court resources is based not on the number of defendants charged or prosecutions commenced, but on extensive expenditure of government resources in an effort to quell the breach – including the deployment of the USCP, the Metropolitan Police Department ("MPD"), the National Guard, and various other state and federal law enforcement agencies – and to clean up and repair the damage done to the Capitol building and grounds by the rioters. *Compare Seefried*, 2022 WL 16528415 at *8-9, with *Seefried*, Gov't Mem. in Aid of Sentencing, ECF No. 115 at 29; *see also Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 39 ("there's no question that this costs the government a lot to respond with law enforcement officers and the delay in the vote, keeping members of Congress there late into the night to finish their job[.]").   The enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources.

*Third*, there is no conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice."   The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011).   And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently.   First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental or court" resources.   Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice."   And, laslty, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

*Fourth*, the application of subsections (b)(1)(B) and (b)(2) only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature itself creates line drawing problems.   Those descriptors themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Seefried*, ECF No. 123 at 1.   For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress.   That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4.   The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2. Under the government's reading, therefore, a sentencing court need not answer difficult questions about

whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

### *Criminal History Category*

The U.S. Probation Office calculated Roche's criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of Roche's total adjusted offense level, after acceptance of responsibility, at 14, Roche's Guidelines imprisonment range is 15 to 21 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Roche's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. He breached the Capitol Building with a large crowd through the Senate Fire Door. He paraded through the building with another crowd of rioters that directly confronted officers trying to contain the riot. Roche then encouraged and joined those rioters that pushed past the officers and ultimately made his way to the Senate Floor, the very place where earlier that day Senators had convened to certify the election. While on the Senate Floor, he shouted and celebrated, while other rioters rummaged through Senators' desks. It was only after a squad of riot police entered the Senate Floor that Roche left the Senate Floor and exited the building. The nature and circumstances of Roche's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 18 months' imprisonment.

**B.      Roche's History and Characteristics**

While Roche does not have any criminal history points, he does have one prior conviction for theft of merchandise.   PSR ¶ 55.   On November 16, 2016, he was sentenced to 11 months and 29 days probation.   *Id.*   Roche's criminal history category of I is reflected in the Guidelines calculation.   Because he remains in Criminal History Category I despite this conviction, his criminal history weighs in favor of imposing a sentence at the midpoint of his Guidelines range.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Roche's criminal conduct on January 6 was the epitome of disrespect for the law. In particular, not only did Roche participate in the breach of the Capitol Building, but he made his way to the Senate Floor, precisely where the certification of the election was to take place, and where only a relatively few rioters had the determination to step foot.   While on the Senate Floor and after exiting the building, Roche celebrated his conduct and the conduct of the other rioters that day, showing a lack of remorse for his conduct.   Specifically, he shouted and prayed while standing behind the Vice President's desk, celebrated getting "a chance to storm the Capitol," bragging (falsely) about "convince[ing] the cops to let us through" and "listening to the will of the people."

**D.      The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases

involving domestic terrorism, which the breach of the Capitol certainly was.[4]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of an 18-month term of incarceration.   While Roche consented to a stipulated bench and agreed to the Statement of Facts filed in connection with that stipulated trial (ECF No. 61), PSR ¶ 31, he has not yet expressed remorse or contrition for his conduct. Regardless, the statements he made after being removed from the Capitol Building on January 6 were not those of one who was remorseful for just having breached the Capitol and making his way to the Senate Floor.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   Roche's own statements that he "managed to convince the cops to let us through," (though untrue) and that the rioters "invit[ed] Christ back into [the] Capitol," demonstrate that he was proud of his conduct and, therefore, his sentence must be sufficient to provide specific deterrence from committing similar crimes in the future.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

**E.     The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.     Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula."   *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v.*

*Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.  "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."  *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The government recommends a sentence at the mid-point of the Guidelines range largely in part due to Roche's conduct entering the Capitol Building, the fact that he traveled all the way to the Senate Floor, and his actions on the Senate Floor, balanced with his lack of physical force or violence on that day.

Roche's conduct is analogous to that of two other defendants recently sentenced by this Honorable Court to the same offenses as Roche – Luke Wessley Bender and Landon Bryce Mitchell. *See United States v. Bender, et al.*, 21-cr-508 (BAH).   Bender and Mitchell both climbed up scaffolding that had been erected for the inauguration of President Biden.   They entered the Capitol Building through the Upper West Terrace Door at approximately 2:45 p.m. and made their way through the Rotunda.   They both made their way onto the Senate Floor at

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

3:04 p.m., approximately the same time as Roche.   While on the Senate Floor, Bender and Mitchell rummaged through documents, sat at Senators' desks, and posed for pictures (taken by Roche) behind the Vice President's desk.   Unlike Roche, however, Bender was a criminal history Category II and Mitchell was a Category IV.   Additionally, for Bender, the government sought an additional enhancement pursuant to U.S.S.G. § 3C1.1, which is not applicable to Roche.   On April 20, 2023, this Court sentenced Bender to 21 months' imprisonment and Mitchell to 27 months' imprisonment.   Accordingly, given that Roche is a criminal history Category I, an 18-month sentence of imprisonment for Roche would avoid any unwarranted sentencing disparities with two very similar cases.

Roche may also be compared to Jacob Chansley, the fellow rioter with whom Roche stood side-by-side behind the Vice President's desk.   *See United States v. Chansley*, 21-cr-3 (RCL). Due to his unusual garb and face paint, Chansley was one of the most recognizable January 6 defendants.   Chansley was among the first rioters to enter the Capitol Building, walking through the Senate Wing Door at around 2:14 p.m.   He confronted police outside the Senate and carried a bullhorn to rile up the crowd.   Chansley entered the Senate Gallery and then entered the Chamber itself.   While there, Chansley occupied the Dais and took pictures with Roche and others. Although he had no prior convictions, Chansley faced a higher sentencing range than Roche – 41 to 51 months – because he received an enhancement for threatening to cause physical injury. Chansley also demonstrated considerable acceptance of responsibility: on January 7, 2021, he called the FBI to identify himself, and drove to an FBI field office to continue his interview, at which time he was arrested. Chansley also was one of the first January 6 defendants to accept responsibility and plead guilty.   Judge Lamberth issued a low-end Guidelines sentence of 41 months.

Roche's conduct has a number of similarities to that of Bender, Mitchell, and Chansley. All three defendants, like Roche, made their way not only onto the Senate Floor, but also near or onto the Senate Dais behind the Vice President's desk. However, the nature and circumstances of Roche's conduct and his history and characteristics are most like that of Mitchell, who was recently sentenced by this Court to 21 months' imprisonment. Accordingly, a sentence of 18 months, at the midpoint of Roche's Guidelines range, would not create any unwarranted sentencing disparity

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes apply here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to only certain offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), such as a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Regardless of whether the MVRA applies, the VWPA applies

to all of Roche's Title 18 offenses, so this Court has authority to order restitution.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h).

That latter approach is appropriate here. More specifically, the Court should require Roche to pay $2,000 in restitution for his convictions on Counts Two and Three. This amount

fairly reflects Roche's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order will not cause an unwarranted disparity.

**VIII.   CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 18 months' imprisonment, 3 years of supervised release, $2,000 in restitution, a $100 mandatory special assessment for Count One, a $25 mandatory special assessment on each of Counts Two and Three, and a $10 mandatory special assessment on each of Counts Four, Five, and Six.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:

CHRISTOPHER D. AMORE
Assistant United States Attorney
Capitol Siege Section Detailee
N.Y. Bar No. 5032883
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20001
Christopher.Amore@usdoj.gov

30